**In re Herbert & Margaret CARLSON, Debtors.**

**Bankruptcy No. 94 B 3557.**

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

Dec. 5, 1995.

Joel Nathan, U.S. Attorney's Office, Civil Division, Chicago, IL.

Herbert P. Carlson, Chicago, IL.

Francis J. Pendergast, III, Rock, Fusco, Reynolds & Garvey, Chicago, IL.

## MEMORANDUM OPINION

ERWIN I. KATZ, Bankruptcy Judge.

This matter comes before the Court on the Objection of Herbert and Margaret Carlson ("Debtors") to the Second Amended Proof of Claim filed by the Internal Revenue Service ("IRS"). Mr. Carlson is an attorney who operates a law office which currently has a support staff and two attorneys working on a case-by-case basis. Mrs. Carlson is not employed. The Debtors file their tax returns jointly, and reported taxable income in the amount of $148,868 for 1990, $268,910 for

1991 and $75,646 for 1992. Mr. and Mrs. Carlson's personal residence is located on Lake Shore Drive, Chicago, Illinois, and was valued at $1,000,000 (subject to a $425,000 secured claim) on the Schedule A filed with the Bankruptcy Court. The property is held in an Illinois Land Trust, with the Chicago Title and Trust Company serving as Trustee, and the beneficial interest has been assigned as security for a loan. Prior to 1994, the Debtors also owned a house in LaPorte County, Indiana, which was scheduled with a value of $125,000.

As a result of their failure to pay federal income taxes for the years 1990, 1991 and 1992, the Debtors incurred $153,824 in tax liability, plus statutory penalties and interest. Also, the IRS assessed the Debtors for unpaid Social Security taxes ("FICA") in connection with the employees working at Mr. Carlson's law office during the second and fourth quarters of 1992.

On December 16, 1992, and December 13, 1993, the IRS filed Federal Tax Lien Notices in Cook County, Illinois, due to the Debtors' failure to pay these liabilities. On February 9, 1994, as a result of continued delinquency, the IRS seized the Debtors' residence in Chicago.[1] Subsequently, on February 11, 1994, the Debtors transferred their Indiana property by warranty deed to their son, Peter Carlson, and on February 15, 1994, the deed was recorded in LaPorte County. On February 22, 1994, Mr. Carlson was notified that the Form 941 and Form 940 Tax Returns for the years 1993 and 1994 (relating to FICA and Federal Unemployment ("FUTA") taxes) were selected for audit by the IRS. On February 23, 1994, the Debtors filed a voluntary petition under Chapter 11 of the Bankruptcy Code ("Code") (11 U.S.C.).

On April 29, 1994, as a result of a defect in an automated system at the IRS, the Service erroneously filed a Federal Tax Lien Notice duplicating the February 9, 1994 Notice. The duplicate Notice was withdrawn on November 8 of that year through the filing of a Certificate of Release by the IRS.

After the Debtors sought bankruptcy protection, the IRS filed a Proof of Claim re-

---

1. The Carlsons still reside in their Lake Shore home. The IRS did not proceed with the sale.

flecting those liabilities secured by its tax lien. Subsequently, on November 14, 1994, and again on March 31, 1995, the IRS filed Amended Proofs of Claim to reflect unsecured priority claims stemming from unpaid FUTA taxes for 1992 and 1993, and FICA taxes for the first three quarters of 1993, in addition to unsecured general claims resulting from the interest and penalties incurred therefrom.

The Debtors object to the IRS's secured claim for interest and penalties on unpaid income taxes for the years 1990 through 1992. First, Debtors argue that cause exists for abatement of the interest and penalties due to violations of the automatic stay in connection with the IRS's duplicate tax lien filing and audit requests after the filing of their bankruptcy petition. Second, Debtors assert that interest and penalties should be abated since the Notice of Seizure issued prior to the IRS's seizure of the Debtors' Chicago residence was not served upon the Trustee of the Illinois Land Trust which held title to the property, or on the mortgagee of their residence. Third, the Debtors claim that sufficient grounds for abatement exist due to the IRS's failure to comply with procedures outlined in the Internal Revenue Manual ("IRM") before seizing their property. Fourth, Debtors assert that "reasonable cause" exists for abatement, since payment of their disabled child's medical expenses prevented them from satisfying their income tax obligations. Finally, the Debtors object to the secured claim for FICA taxes and unsecured priority claims for FICA and FUTA taxes on the grounds that the IRS wrongly characterized workers at Mr. Carlson's law office as "employees" rather than "independent contractors."

The IRS argues that its secured claim for interest and penalties on the outstanding income tax liabilities is valid, given that Debtors' arguments are unsupported by existing law, and that they have not sustained their burden of producing evidence to show that "reasonable cause" exists for the abatement.

Furthermore, the IRS maintains that the Debtors owe FICA and FUTA taxes for the years in question, since they have not met their burden of coming forth with evidence to rebut the IRS's claim characterizing the workers as "employees."

This Court finds the IRS to be correct with respect to their secured claim for interest and penalties on the Debtors' unpaid income taxes. However, the IRS wrongly characterized attorneys working in Mr. Carlson's law office after March 31, 1993, as "employees."

The Court has jurisdiction to hear this matter under 28 U.S.C. § 1334, and General Rule 2.33(A) of the United States District Court for the Northern District of Illinois. This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(B).

## I. STATEMENT OF LAW AND DISCUSSION

### A. Assessment of Interest and Penalties on Unpaid Income Taxes

#### 1. Abatement of interest on unpaid income taxes

■ The IRS assessed the Debtors with interest obligations under § 6601(a) of the Tax Code (26 U.S.C.) due to unpaid income tax liabilities for 1990, 1991, and 1992. Section 6601(a) states, in pertinent part, "[i]f any amount of tax imposed by this title . . . is not paid on or before the last date proscribed for payment, interest on such amount . . . shall be paid for the period from such last date to the date paid." 26 U.S.C. § 6601(a) (1989 & Supp.1995).

The Debtors petition the Court to abate the interest portion of the IRS's secured claim under § 505(a) of the Code.[2] However, accrual of interest on the underpayment of taxes is mandatory under § 6601 of the Tax Code, and courts have been unwilling to provide equitable exceptions due to its unambiguous language. See *In re Cabazon Indian*

---

**2.** Section 505(a)(1) states, in pertinent part, "the court may determine the amount or legality of any tax, any fine or penalty relating to a tax, or any addition to tax, whether or not previously assessed, whether or not paid, and whether or not contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction." 11 U.S.C. § 505(a)(1) (1989 & Supp. 1995).

*Casino,* 57 B.R. 398, 403 (9th Cir. BAP 1986), which noted that "under § 6601, payment of interest on the underpayment of tax is required. There is no provision in the statute for an exception." See also *Johnson v. United States,* 602 F.2d 734, 739 (6th Cir.1979), which held a District Court's invocation of equity to reduce interest owing under § 6601 to be "clearly erroneous," and *United States v. Means,* 621 F.2d 236, 238 (6th Cir.1980), where the court determined that no "good faith" exception exists under § 6601(a) for the tolling of interest penalties during the time a liability is contested.[3]

Consequently, this Court declines to abate the interest assessments claimed against the Debtors due to their non-payment of income taxes from 1990 through 1992.

### 2. Abatement of penalties due to violations of the automatic stay

The IRS also imposed penalties under § 6651(a)(2) and § 6654(a) of the Tax Code.[4] The Debtors argue that due to automatic stay violations by the IRS, the Court should abate such penalties either under its general equitable powers, or its authority to make tax liability determinations under § 505(a) of the Code.

■ The Debtors first claim that the IRS violated the automatic stay by filing a duplicate Tax Lien Notice on April 29, 1994, after commencement of the bankruptcy proceeding. It is uncontested that the duplicate Notice involved only those claims secured by the February 9, 1994, filing.

Section 362(a)(4) of the Code imposes a stay on "any act to create, perfect, or enforce any lien against property of the estate." 11 U.S.C. § 362(a)(4). Its intended effect is to preserve the status quo as of the date of the bankruptcy proceeding. However, the duplicate filing of the Tax Lien Notice by the IRS cannot be construed as an act to "create, perfect, or enforce" a lien interest, since due to the prior filing it could not establish new rights, or advantage the IRS vis-a-vis other creditors during the bankruptcy. Thus, it does not constitute a violation of the automatic stay.

■ The Debtors next argue that the automatic stay was violated as a result of audit requests made by the IRS on February 22, 1995, and March 10, 1995, pertaining to unpaid employment taxes for 1993 and 1994. At the hearing the IRS represented that these requests were made for the purpose of calculating the amount of tax liability.[5]

Under § 362(b)(9) of the Code, the IRS was allowed to issue to the Debtor a Notice of Tax Deficiency, and *a fortiori,* engage in inquiries related to the calculation of such liability. *H & H Beverage Distributors v.*

---

**3.** Section 6404(e) of the Internal Revenue Code gives the IRS discretion to abate interest when the assessment is determined to be attributable to errors or delays by officers or employees of the Service. However, the Debtors have not sought relief under § 6404(e) with the IRS, and it is doubtful that an administrative decision by the Service pursuant to this Section is subject to judicial review. *See Selman v. United States,* 941 F.2d 1060, 1064 (10th Cir.1991) (noting that the "language, structure and legislative history of IRC § 6404(e)(1) indicates that Congress meant to commit the abatement of interest to the Secretary's discretion" and precludes judicial review); *Bax v. Commissioner,* 13 F.3d 54, 58 (2nd Cir. 1993); *Horton Homes, Inc. v. United States,* 936 F.2d 548, 551–52 (11th Cir.1991).

**4.** Section 6651(a)(2) states, in pertinent part, "[i]n case of failure ... to pay the amount shown on any tax return ... on or before the date proscribed for payment of such tax ... unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall

be added to the amount shown as tax on such return [a penalty]. 26 U.S.C. § 6651(a)(2). Section 6654(a) states, in pertinent part, "in the case of any underpayment of estimated tax by an individual, there shall be added to the tax ... an amount determined by applying—(1) the underpayment rate established under § 6621, (2) to the amount of the underpayment, (3) for the period of the underpayment." 26 U.S.C. § 6654(a).

**5.** The current Code was amended in 1994 to explicitly allow such audits. *See* 11 U.S.C. § 362(b)(9)(A). Except for certain specific exceptions, amendments to the Code under the Bankruptcy Reform Act of 1994, Pub.L. No. 103–394, § 704, 108 Stat. 4106 (1994), only affected those cases filed after the effective date of October 22, 1994. Thus, given that the Debtors' bankruptcy petition was filed prior to the effective date of the 1994 Amendments, the determination as to whether the audit requests constitute a violation of the automatic stay must be made with respect to the pre-Amendment Code.

Department of Revenue, Commonwealth of Pennsylvania, 850 F.2d 165, 168–69 (3rd Cir. 1988). However, it was prohibited from formal assessment of the tax liability and the creation of liens. See H & H Beverage Distributors, 850 F.2d at 168–69, and In re Ribs–R–Us, Inc., 828 F.2d 199, 203 (3rd Cir. 1987), where the court stated that "by filing a petition for reorganization, a debtor obtains a stay of pending and future litigation, including assessment of federal tax liabilities."[6] Consequently, since the audit requests were made to enable the IRS to calculate the proper amount of Debtors' 1993 and 1994 employment tax liabilities, they were not violations of the automatic stay.

### 3. Abatement of penalties due to the IRS's improper notice of seizure

■ The Debtors argue that, under the Court's § 505(a) authority to make tax liability determinations and under its general equitable powers, their income tax penalties should be abated since the IRS failed to give "Notice of Seizure" to the Illinois Land Trust Trustee and the Debtors' mortgagee after seizure of its Chicago residence. These arguments are without basis under existing law, and the abatement relief requested must be denied.

■ Failure of the IRS to give "Notice of Seizure" to all parties of interest does not affect a taxpayer's liability, and accordingly does not allow a court to abate penalties relating thereto under § 505(a). Rather, issuance of a "Notice of Seizure" is an element of the collection procedure mandated by the Internal Revenue Code. Under § 6335 of the Tax Code, after a Notice of Intention to Levy has been issued and a levy has been executed, Notices of Seizure and Sale must be served upon all owners or holders of rights in the property in order to achieve a valid sale. Although failure to give such Notice may cause a subsequent sale to be invalid (Johnson v. Gartlan, Jr., 334 F.Supp. 438 (E.D.Va.1971)), it has no effect on the underlying tax liability. Also, the Debtors

were served with the Notice. Thus, no basis exists for invocation of the Court's equitable powers.

■ The Debtors' also claim that abatement relief is appropriate due to the IRS's failure to comply with the IRM's guidelines for contacting delinquent taxpayers prior to the seizure of their property. The Tax Court has noted that "non-compliance [with IRM requirements] does not render the action of the [IRS] invalid," and "the procedures of the IRS do not have the force or effect of law." Vallone v. Commissioner, 88 T.C. 794 (1987). In this case, therefore, neither does such failure serve as grounds for abatement of the Debtors' income tax penalties.

### 4. Abatement of penalties due to "reasonable cause" of the Debtors

■ The Debtors argue that penalties on their unpaid income taxes should be abated since the $170,000 in medical expenses which they incurred for treatment of a disabled child created "reasonable cause" for their failure to pay.

Section 6651(a)(2) of the Tax Code, upon which the Debtors' penalties are based, provides that penalties may be avoided if "it is shown that such failure [to pay] is due to reasonable cause and not due to willful neglect." 26 U.S.C. § 6651(a)(2). The Supreme Court has noted that "the term 'willful neglect' may be read as meaning a conscious, intentional failure or reckless indifference." United States v. Boyle, 469 U.S. 241, 245, 105 S.Ct. 687, 689, 83 L.Ed.2d 622 (1985). The Treasury Department has explained, "[a] failure to pay will be considered to be due to reasonable cause to the extent that the taxpayer has made a satisfactory showing that he exercised ordinary business prudence in providing for payment of his tax liability and was nevertheless either unable to pay the tax or would suffer an undue hardship if he paid on the due date." Treas.Reg. § 301.6651–1

---

**6.** See also 1A Collier on Bankruptcy, ¶ 12.06[2] (15th ed. & Supp.1995) (noting "[a]s a rule, however, the institution or continuation of an examination division audit should not constitute a violation of the protective stay when the IRS is only attempting to calculate a tax liability, and is not actually attempting to assess or collect a calculated tax liability").

(1991).[7] "A taxpayer will be considered to have exercised ordinary business care and prudence if he made reasonable efforts to conserve sufficient assets in marketable form to satisfy his tax liability and nevertheless was unable to pay all or a portion of the tax when it became due." Treas.Reg. § 301.6651–1(c)(1) & (2) (1991). Furthermore, "the term 'undue hardship' means more than an inconvenience to the taxpayer. It must appear that substantial financial loss, for example, loss due to the sale of property at a sacrifice price, will result to the taxpayer from making payment on the due date of the amount with respect to which the extension is desired." Treas.Reg. § 1.61611(b) (1991).[8]

■ Outside of the bankruptcy context, the burden of proof rests on the taxpayer in disputes with the IRS over the validity of claims. *Helvering v. Taylor,* 293 U.S. 507, 515, 55 S.Ct. 287, 290, 79 L.Ed. 623 (1935). However, in bankruptcy, the burden of proof lies on the claimant with respect to any claims asserted against the debtor. Under Bankruptcy Rule 3001(f), "a proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim." Fed. R.Bankr. 3001(f).

■ Currently, a division exists among the Circuits as to whether the IRS or the taxpayer has the ultimate burden of proof when tax claims are objected to in bankruptcy. While some courts have held that the taxpayer retains the same burden of proof he would have assumed outside of bankruptcy, *In re Landbank Equity Corp.,* 973 F.2d 265,

270–71 (4th Cir.1992); *In re Resyn Corp. v. United States,* 851 F.2d 660, 663 (3rd Cir. 1988); *In re Uneco, Inc.,* 532 F.2d 1204, 1207 (8th Cir.1976), others have determined that the IRS bears the burden due to its assertion of the claim in the bankruptcy context. *California State Bd. of Equalization v. Official Creditors' Committee,* 837 F.2d 696, 698 (5th Cir.1988); *In re Gran,* 964 F.2d 822, 827 (8th Cir.1992); *In re Federated Dept. Stores, Inc.,* 135 B.R. 950, 957–58 (Bankr.S.D.OH.1992); *Internal Revenue Service v. Levy,* 130 B.R. 28, 32 (E.D.Va.1991); *In re Dakota Industries, Inc.,* 131 B.R. 437, 444 (Bankr.D.S.D. 1991). However, when the ultimate burden of proof is placed upon the IRS, the debtor is required to produce some evidence to shift the burden of going forward. *Fidelity Holding Co., Ltd.,* 837 F.2d at 698.

After considering the testimony and evidence introduced at the hearing on this matter, irrespective of who has the ultimate burden of proof, it is clear that Debtors did not make a sufficient showing to rebut the penalty portion of the IRS's secured claim. Debtors claim that because of their medical expenses "reasonable cause" exists to abate the penalties.[9] However, in pursuing this line of reasoning they neglected to show how their circumstances warrant relief under the legal requirements of § 6651(a)(2) of the Tax Code.

The Debtors may very well have shown that their failure to pay income taxes was "not due to willful neglect." Mr. Carlson testified that his mind was too preoccupied

7. The Supreme Court has noted that this interpretation of "reasonable cause" by the Treasury Department "merits deference," since it is "consistent with Congress' intent, and over 40 years of case law as well." *United States v. Boyle,* 469 U.S. 241, 246 n. 4, 105 S.Ct. 687, 690, 83 L.Ed.2d 622 (1984).

8. The Court finds these Treasury Regulations to reasonably construe the "reasonable cause" requirement under § 6651(a)(2) of the Internal Revenue Code. Therefore, we defer to their interpretations. *Goulding v. United States,* 957 F.2d 1420, 1423 (7th Cir.1992) (noting that "Treasury Regulations are presumptively valid, and the courts defer to them so long as they are reasonable" (citations omitted)).

9. No authority exists for the proposition that substantial medical expenses, alone, constitute "reasonable cause." The only support for this argument lies in the Internal Revenue Manual, which outlines certain reasons warranting relief to taxpayers from penalties due to the late payment of taxes. Among the reasons is "delay ... caused by death or serious illness of the taxpayer or the death or serious illness in his/her immediate family." Int.Rev.Man. § 4562.2 (1988). However, the Court does not consider this directory binding in the case at bar, since, as noted earlier, the IRM "does not have the force or effect of law." *Vallone v. Commissioner,* 88 T.C. 794, 804 (1987). Furthermore, even if the IRM did, no evidence was presented to show that the Debtors' situation involved the type of "serious illness" contemplated by the Manual.

with his son's disability, as well as the law office and workers he was supporting, to give serious consideration to his tax liabilities or financing alternatives.

However, no showing was made to suggest that his failure to pay resulted from the "reasonable cause" required under § 6651(a)(1) of the Tax Code. Debtors did not bring forth any evidence revealing that they "exercised ordinary business care and prudence in providing for payments of [their] tax liability." Treas.Reg. § 301.6651–1 (1991). To the contrary, Mr. Carlson testified that he routinely made allowances for household expenditures and other outstanding obligations without considering tax liability, and admittedly did not seek financing to use as payment for his outstanding taxes.

Furthermore, Debtors did not present evidence that they were unable to pay their taxes or would have suffered an "undue hardship" if they had paid on the due date. *See id.* Mr. Carlson's testimony tends to prove that their failure to pay was due to his preoccupation with other matters rather than an inability to pay. The record reveals that the Debtors did in fact possess the resources to pay their income tax liabilities. Mr. Carlson noted that he had the opportunity to obtain loans to pay his taxes by pledging his residence as security through December of 1992, when the IRS finally placed a lien on his Chicago condominium. The Debtors' tax returns reveal that they had $765,477 of total gross income for the years 1990 through 1992. Also, their Schedule A filed with the bankruptcy petition shows that real estate owned during the years for which income tax liability exists (the Chicago condominium and house in LaPorte County, Indiana) has a fair market value totalling $1.125 million with only a $425,000 mortgage. Even after the tax lien was assessed, they could have refinanced and paid their taxes out of proceeds at the closing. In addition, although Mr. Carlson testified to having $170,000 in medical expenses from 1990 through 1992, no

evidence was presented as to how much money remained to pay taxes, or whether payment under the circumstances would exact a "undue hardship" on the Debtors.

Consequently, Debtors have not met their burden of coming forth with evidence showing that their circumstances between 1990 and 1992 constitute "reasonable cause" for not paying their income taxes under § 6651(a)(2) of the Tax Code. The Court, therefore, denies Debtors' request to abate the penalties asserted by the IRS in their Second Amended Proof of Claim.

## B. Objections to 1992–93 FICA and FUTA Liability

Under the Internal Revenue Code, an employer is required to pay one-half of the total FICA taxes assessed against its employees, and withhold from paychecks those FICA taxes owed by the employees themselves. 26 U.S.C. §§ 3101, 3102(a), 3402(a). Also, the employer is obligated to pay Federal Unemployment Taxes for its employees. 26 U.S.C. § 3101. However, these obligations are only incumbent upon an employer if its workers are determined to be "employees" under the Tax Code. Debtors object to the unsecured priority tax claim of the IRS for FICA and FUTA taxes during 1992 and 1993, as well as their secured claim for FICA taxes in 1992, on the grounds that workers at Mr. Carlson's law office were "independent contractors" rather than "employees."

Section 3121(d)(2) of the Tax Code defines an employee for employment tax purposes as "any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee." 26 U.S.C. § 3121(d)(2) (1992). A Regulation issued by the Treasury Department has noted that the determination of whether a worker constitutes an "employee" turns on the degree of control exercised by the employer over the individual. Treas. Reg. § 31.3121(d)–1 (1992).[10]

---

**10.** This interpretation is considered "reasonable" and afforded deference by the Court given its substantial support by other courts dealing with the issue. *In re Arndt,* 158 B.R. 863, 867 (Bankr. M.D.Fla.1993); *In re Rasbury,* 130 B.R. 990, 995 (Bankr.N.D.Ala.1991); *In re Imholte,* 118 B.R. 103, 107 (Bankr.D.Alaska 1990).

Other courts have applied twenty-six factors to evaluate whether workers should be considered "employees" for tax purposes under the common law rules analysis. However, these factors are only indicia in the determination of what constitutes control so as to aid the court in its analysis

**462**

As discussed previously, given that this objection arises in the context of a bankruptcy proceeding, the Debtors must bring forth evidence to rebut the IRS's claim construing its workers as "employees," regardless of with whom the ultimate burden of proof lies.[11]

### 1. Secretaries

A portion of the FICA and FUTA taxes assessed by the IRS for 1992 and 1993 relates to the secretaries working in Mr. Carlson's office. The Debtors brought forth no evidence to rebut the presumptive validity of the IRS claim, and all evidence presented at the hearing indicates that Mr. Carlson exercised "control" over the secretaries.

The secretaries received their assignments and instructions from Mr. Carlson. Mr. Carlson engaged in the hiring, supervising and payment of the secretaries. The secretaries worked on the law office premises, and were paid at an hourly rate. Furthermore, Mr. Carlson provided the staff with the necessary tools and materials for the job.

The Debtors have not met their evidentiary burden. Consequently, the Debtors' objections regarding the assessment of FICA and FUTA taxes with respect to their secretaries will be denied.

### 2. Law office attorneys

The balance of the FICA and FUTA taxes assessed by the IRS for 1992 and 1993 involve attorneys who worked at Mr. Carlson's law office during that period. Mr. Carlson, Peter Carlson, his son, and an attorney working at the law office, and Walter Hughes, Mr. Carlson's accountant, presented testimony bearing on whether the office attorneys should be characterized as "independent contractors."

Prior to 1993, Mr. Carlson's law office enjoyed financial success. At one point in time during the 1980's, Carlson had four or five attorneys working for him. However, as evidenced by the decline in Mr. Carlson's personal income from 1990 through 1993, the practice fell on hard times.[12] To preserve the viability of his practice, Mr. Carlson reduced the number of attorneys working at his office, and after the first quarter of 1993, altered the residual attorneys' status from that of "employees" to "independent contractors."

This change was evidenced by the payment scheme and working environment that ensued. As "independent contractors," the attorneys worked on a per case basis at an hourly rate, with payment contingent upon completion of particular cases. Also, Peter Carlson testified that upon his change in

of whether these workers can be considered "employees."

**11.** The IRS argues that in classifying the workers, Debtors bear the burden to produce evidence showing that the workers either satisfy a "Safe Harbor" set forth in § 530 of the Revenue Act of 1978, or demonstrate "a reasonable basis for not treating the workers as employees." In doing so they cite to Revenue Procedure 85–18. This interpretation of the law appears to be incorrect.

The § 530 "Safe Harbor" provision of the Tax Code (26 U.S.C. § 3401) allows taxpayers to receive "independent contractor" tax treatment of its workers, notwithstanding application of the common law rules analysis under § 3121(d)(2). Its purpose was to protect taxpayers from assessment by the IRS due to misclassification of workers as "independent contractors" when they had acted in good faith in doing so. *In re Arndt,* 158 B.R. at 869. To qualify for "independent contractor" tax treatment the taxpayer has to show (1) it did not treat the workers as employees for employment tax purposes; (2) all federal tax returns for periods after 1978 (including infor-

mational returns) did not treat the workers as employees; and (3) the taxpayer had a reasonable basis for not treating the workers as employees. The statute lists specific instances in which the taxpayer will be considered to have a reasonable basis for not treating individuals as employees. After denoting these specific instances as "safe havens," a Revenue Procedure statement by the Service notes that "a taxpayer who fails to meet any of the three 'safe havens' may nevertheless be entitled to relief if the taxpayer can demonstrate in some other manner, a reasonable basis for not treating the individual as an employee." Rev.Proc. 85–18 (1985).

Thus, in arguing that the appropriate legal standard requires the Debtors to show "a reasonable basis for not treating its workers as employees," the IRS failed to appreciate that application of Revenue Procedure 85–18 is limited to the § 530 "Safe Harbor," which is not claimed by the Debtors in the case at bar.

**12.** The Carlsons reported taxable income for 1990 at $148,868, for 1991 at $268,910, for 1992 at $75,646, and for 1993 at $29,450.

status to an "independent contractor," he began to set his own hours and supply his own work materials. He developed his own practice from advertisements in his name and referrals from his friends, without sharing the proceeds with Mr. Carlson. Also, he began leasing office space and equipment from Mr. Carlson in exchange for services.

Furthermore, the change in status of the attorneys was revealed in the Debtors' records. Stubs from checks issued to the attorneys after March 31, 1993, indicate that no employee wages were paid. In addition, subsequent to that date attorneys received 1099 Tax Forms, as opposed to W–2 Tax Forms, indicating a change to an "independent contractor" relationship.

The arrangement between Mr. Carlson and the law office attorneys subsequent to March 31, 1993, reveals that Mr. Carlson relinquished "control" over the attorneys as "employees," and has since treated them as "independent contractors." Consequently, regardless of where the ultimate burden of proof lies, the evidence presented at the hearing requires attorneys at Mr. Carlson's law office after March 31, 1993, to be considered "independent contractors." Thus, the IRS claim for employment taxes stemming from this relationship will be disallowed beyond March 31, 1993.

## II.   CONCLUSION

The Court, therefore, finds that the IRS's secured claim for interest and penalties on the Debtors' unpaid income taxes for years 1990, 1991, and 1992 shall not be abated. However, the IRS's unsecured priority claim for unpaid 1993 employment taxes beyond March 31, 1993, relating to attorneys shall be disallowed.

The IRS is directed to submit a proposed Judgement Order reflecting the total amounts due, on or before December 22, 1995, on Notice to the Debtors. Any objections thereto by the Debtors are to be filed by January 10, 1996. This matter is set for Entry of Judgement on January 17, 1996, at 10:30 A.M.